8-0 Southern Iowa. Courtney Sanders v. Kyle Thies et al. And just a note for the panel, John Haraldson, counsel for one of the appellees, ceded his time to attorney Guidelock, but he is present should the court have any questions for him. Thank you, Ms. Rudolph. Ms. Messmer. Thank you. May it please the court and Mr. Saunders. Racial bias can sometimes play a role in policing, but jurors are capable of identifying bias when it happens, even if there's no similarly situated white person to compare to. The purpose of summary judgment is to dispose of factually unsupported claims, and that purpose was not served in this case because there's a lot of evidence from which a jury could conclude that this interaction was motivated by Mr. Saunders' race. If this case cannot survive summary judgment, what case can? If this case can't survive summary judgment, the Equal Protection Clause is essentially worthless when it comes to protecting black motorists in the 8th Circuit. Mr. Saunders is simply asking the court to apply ordinary equal protection standards because if the court does so, this is a case where summary judgment should be denied and it should be heard by a jury. You asked the rhetorical question, and I'm going to bite. You shouldn't in arguments, but I'm going to bite. What about our Jelani case, G-I-L-A-N-I, and some of the language in it sounds like you've got to show that law enforcement treated differently persons of another race who are just like your client. If I'm recalling that case correctly, and this is really my, I think, primary problem with the 8th Circuit's jurisprudence when it comes to discriminatory policing, is that the court has adopted these Armstrong standards from a selective prosecution context that they just should not apply because the interests are totally different in a discriminatory policing case. I absolutely think the 8th Circuit has said that that is a requirement in prior cases, but I don't think that's something that's really been examined. I think this is an appropriate case for the court to take another look at that standard and talk about whether we should impute those standards from Armstrong into a discriminatory policing context because there's a lot of criticism, scholarly. It's something that other circuits are recognizing, state courts are recognizing. Recently, in the 2019 Neves Supreme Court decision, it's something that Justice Gorsuch and Justice Sotomayor both recognized when they wrote separately that that case is a different context, but they were talking about should we apply Armstrong in other contexts, and Justice Gorsuch talks about how we need to think really hard about whether that's appropriate to do because there's a circuit split on this. I think that's the thing. There's not any Supreme Court precedent specifically on the question of discriminatory policing. The best we can do is the Armstrong selective prosecution case. I know other circuits have drawn on Batson or other racially motivated constitutional issues to talk about what the standard should be, but simply to just apply Armstrong without any serious critique of it I think is an error because it's a completely different context where you're dealing with prosecutors, and the whole Armstrong decision is based on the fact that prosecutors are agents of the president, and they're entitled to a lot of discretion there or deference that way where there's a presumption of regularity. When we're talking about police officers, that presumption doesn't apply at all. Police officers are typically witnesses in criminal cases. Their credibility is often attacked in those cases, and I think that the nature of interactions between police and citizens is quite different than that of prosecutors and citizens, and that justifies a different standard as well. I was just going to say, we're bound by what prior panels say, as you well know, and so I guess my question for you is how does this case fit within our prior precedent? Knowing full well that you disagree with our prior precedent, we can't do anything about it as a panel. We've just got to figure out if it complies, so I'm just asking you to help me out to try to figure out what we do with our existing precedent. I think the best read I could give of the existing precedent is that, for example, the Eighth Circuit Crooks case, when it's talking about what the standard is and it's citing Armstrong, it says normally a plaintiff must prove a similarly situated individual is not stopped or arrested, so I think that maybe it could be the normal standard, but when there's a lot of other evidence that the court could look to, they could say, hey, this is a case where we're not going to require that similarly situated white person or non-minority person because, based on this other evidence we're seeing in the record, we do think that there is a fact question. Well, is there a similarly situated non-minority individual in this case or is there not? I'm just trying to figure that out. So I think the strongest thing, there's not an exact one for this specific instance with Mr. Saunders. The thing that I think is kind of a red flag that's like that is the fact that there's another illegally parked car there and the police officer doesn't do anything about that or doesn't check into who owns that car. Is it a white person or black person? We don't know, but the more on point comparison that has to do with Officer Tease is this stop that he makes in Union Park in Des He makes two stops that same night and the first stop he makes is of two white people who actually were violating park rules and his interaction with them is night and day different than the interaction he has with two young black men a little bit later after they exit the park. And one thing I wanted to really emphasize for you all is I hope that you watch these videos because I don't think that the written materials can convey how odd some of these interactions are. And I think that that, especially if you're talking about how would a jury feel about these, when you watch the videos, it's just really strange the way the Officer Tease in particularly interacts with people. So this issue with the park, he treats the white couple, even though they've got criminal records, are on probation. He specifically says, like, I think if I investigated, I'd find something, but I'm going to go ahead and let you go, even though you were committing a violation and I'm not going to search you. These two black men he interacts with just from the same park. There's no violation justifying the stop of these young men. He accuses one of having a gun, even though there's nothing to justify that. He doesn't follow the script of saying why you're pulled over or anything like that. So that's the most clear cut difference I could find a discovery of. Here's a, you know, close in time, white person and black person treated differently. Well, you might be, I mean, I understand the example, but when you look at the video, actually, it looks like the cars parked pretty darn near a fire hydrant. I mean, it is. I can't tell whether it's five feet, six feet, seven feet, but it certainly is arguable probable cause. Now, it may well be that he was treated differently. I'm just saying it looks like there was a violation there as well. I'll concede that my better Fourth Amendment argument is the extension of the stop argument. I know that one's a little tenuous, but in any event, an equal protection claim can stand independent of a Fourth Amendment claim. So I don't think, and that's really my biggest problem in this case is, I think this is a repeated problem with Officer Tease, where we've caught him treating another black motorist differently. And that's the claim that is the strongest, I think, in this case that gets to the heart of what went wrong here that the jury should be able to hear. Counsel, to what extent is your case different from many, many cases in the fact that your client stops on his own volition, his own idea to stop, and where he stops, and he wasn't really even stopped by the police, which is extremely rare if you look at our cases. I actually think that's kind of a common issue that comes up when we're talking about discriminatory enforcement, though, because I think it's the people that are singled out when they aren't really doing anything wrong, that that's where we have the most problem. No, he was already, he had picked where to park next to the fire hydrant. I think you know what I mean, though, that that's just not a significant thing, or not the real reason. But in terms of your question of him not being stopped, I do tend to disagree that a reasonable person would feel free to leave here. He can't just drive away to the front because he's behind another car. He can't back away because the pattywag is in the middle of the street. He's got two officers on either side. There's shining flashlights in his car. A reasonable person, I don't think, would feel comfortable just going ahead and hightailing it out of there. So I do think that there's an argument that a seizure was made prior to Officer T's looking in the back seat and finding the bottle and seeing this young girl in the back seat, too. I was just gonna say, what about the fact that this makes it different from the others? Your client was talking on the phone for most of the interaction with the officer, and so the officer was kind of waiting around, from what I could tell from the record, trying to talk, and there was the response, oh, is there a problem here? And he's kind of, just now he's finally shining the flashlight after a while. Does that make any difference on equal protection, that nothing like this happened with respect to the other couple you talked about? You mean the kind of delay? The delay. I mean, if I'm standing there, I'm just, I'm being honest, if I'm standing there, maybe that's a different interaction with waiting for somebody to get off the phone and not interacting with the officer versus encountering somebody who is engaged in a conversation with the officer. I think the exchange that is kind of the most telling and the oddest and most characteristic of how Officer T's does things is, the first thing that Courtney Saunders says is, is there a problem here? And instead of saying, yeah, you're parked by a firefighter, what's going on? He says, Officer T says, well, what do you mean? Like, is there a problem? And there's just like, like, there's not like a normal back and forth. And like the Union Park stop is another one where Officer T's responses to the young man just don't really go together. Like, he's just kind of, kind of picking at him, trying to get a reaction. But yeah, I recognize he's on the phone and maybe that's something a jury could consider. I think I could say these are red flags. The defense could say these aren't red flags, that he's just being polite and waiting. And that's up to the jury to decide if this was a good excuse for how this all went down or not. I also wanted to go back to your question, Justice Ross, about how can we deal with existing Eighth Circuit law to say I could still move forward on this claim? We've still got the Supreme Court case law saying in an equal protection case that those ordinary standards are race just needs to be a motivating factor. And there's nothing specific from the Supreme Court saying that this requires a specific comparator. That doesn't comport with, I think, the Supreme Court case law in other equal protection contexts. So I think the court could still draw on those typical standards in other cases to say that this is a case that can move forward. Another thing I would point out is I really think the Tenth Circuit's analysis in Marshall is really good. They recognize this as an open question and talk about the different Supreme Court cases and as they develop their own standard. And one thing that Marshall notes is that police and citizen interactions are more susceptible to traditional nodes of proof than, say, a selective prosecution claim where you don't have an interaction between a citizen and the prosecutor in the same way that you do have the interaction between these officers and Mr. Saunders. So I do think even based on this Eighth Circuit's law, the court could say there's a fact question here. And another thing I would want to point out in that respect is I believe it was the Crooks decision and Judge Lay had a dissent in that case talking about how the summary judgment standards also that you've got to, when there are fact questions, you need to let these things go through and not create these other barriers that don't exist in typical summary judgment law. We've kind of created or let this come to pass where we've swept in case law from other contexts that is not appropriate. The summary judgment should allow... Counselor, you're within your rebuttal. I was trying to wait for the end of the sentence to tell you. Anyway, I do think that the summary judgment standards typically applied should allow this case to go to a jury. Thank you. Okay. Thank you for your argument. Mr. Guidelock. Thank you, Your Honor. May it please the court. My name is Gary Guidelock. I represent Senior Police Officer Kyle Teese in this matter, and I'm presenting an argument today on behalf of all the defendants slash appellees. This case presents straightforward application of well-settled principles governing police interaction with the citizens in the context of a 22-minute interaction between Courtney Saunders and two Des Moines police officers, Kyle Teese and Clint Deacon. The outcome of this case is dictated by well-settled Fourth Amendment, Fourteenth Amendment, qualified immunity, and summary judgment jurisprudence. And based upon the application of those well-settled principles to the undisputed facts of this case, we're asking that this court affirm the well-reasoned decision of the district court in all respects. I wanted to address some of the questions and issues that came up during Ms. Messimer's argument and provide some additional background and hopefully answer some of the court's questions. We think that, as we said initially, there are well-settled principles that govern the outset of this case. Over 20 years of cases from this circuit discussing equal protection jurisprudence require that the plaintiff in such a case show that the plaintiff's race was the sole reason for the officer's decision. Well, counsel, isn't, isn't, I tried to figure that out, isn't the, aren't the earliest cases, say, at least partially based on race? And as you know, the earliest cases of our court control, and that's the 1990s case to put in a quick, quick sentence for you. So isn't it, if we got to that point of it, isn't it at least partially based on race? I don't, I don't think that's the state, your honor. I think if we look at some of those 90s cases, they say in the context of an equal protection violation in a police case, they talk, they, they say that the action must be based on whether it's solely or motivated by, but the court has had multiple opportunities to revisit these decisions since 2000. And on multiple occasions has held that it must be solely based on race. Well, but don't we go by the earliest line of cases? Um, I don't, I, well, I don't think there's a dispute between the earliest cases and these cases in this context, your honor. And because the cases that we've cited and specifically Jelani, which is the court that you're, or the case that your honor, uh, addressed earlier, we think Jelani absolutely controls the outcome of this case. There are, there are a number of similarities between Jelani in this case, including, um, as judge Strauss asked, um, about whether the plaintiff being on the phone at the time of the initial contact, um, that was in the Jelani case as well. The plaintiff was on his phone when the officers first approached him in that case. Um, and actually in that case, the officers had to remove his phone from, um, from his hands. And the reason I raised that specifically in the context of this case, not only because your honor asked about it, uh, but it's relevant to both the, the onset of the, the stop in the investigation and the continuing nature of the investigation. Before you move on to that, on that exact point, um, I just wanted to ask you, so, you know, body cams, videos, all of this kind of changes things a little bit because you can now see the interactions between, uh, cops and members of the public. And so there seems to be a sharp difference between the way he treated the earlier couple and treated, uh, treated, uh, you know, uh, this particular person. And so I don't know if it's because he viewed it as disrespectful because Saunders was on the phone. I don't know if it's because Saunders was black. I don't have the foggiest clue, but there seems to be a stark difference between the way that two are treated. So what do we do with that? Maybe it's not actionable. Maybe it is, um, but it does seem to be two different encounters. Your honor. I think first of all, they're, they're not similarly situated in all respects, which is part of the other analysis that we'll discuss, um, regarding comparators. Um, but I don't, I think that whether, whether it's starkly different as a subjective question, um, that the court has raised. And as you said, you don't know why the difference exists and the, and the, the requirement is that the plaintiff must put forth evidence showing that Mr. Saunders race was the reason for that, for any difference in treatment between him and applicable comparators. Another problem with the plant's case, Mr. Saunders case is however, that he hasn't presented any applicable, applicable comparators. There's no other videos or other, other, um, interactions with somebody who was parked illegally, um, in front of a fire hydrant. Ms. Messmer in her argument discussed the other unattended vehicle that was parked in that same zone. And I would point out in addition to him parking directly in front of the fire hydrant, he was also parked between no parking signs, which further indicated that that was not a place for him to park, but a distinction between his parking there at that time. And the parked vehicle that, uh, they did not investigate is that that could have provided an opportunity to get information about what, how long he was going to be parked there, whether he was going to be moving his vehicle. And that goes into the further interactions between officer these and Mr. Saunders, um, as, as the encounter started. Well, let me ask you this. The most troublesome thing to me is that this is an odd situation. The, the, the way the driver stopped himself, where the driver stopped, the reasons given, uh, the noncompliance with police protocol, the use of the paddy wagon, everything about this case is abnormal. And I got to thinking that what it does is under our precedent, the more abnormal and odd the policing, the less likely it plainly will have a case. So if it's a really odd case, the plaintiff won't have a case. How do we get around that? And that seems kind of wrong, uh, on the right set of facts. What do you say to that? I, I guess I want to make sure I understand your question, your honor. You're saying that, uh, because they're, because the more odd it would be, the fewer comparators there would be. Yeah. Very good. Go ahead. And I think, you know, as much as I would love to ask this court to adopt a very stringent reading of the case law that says that the comparator must be, uh, similarly situated in all relevant respects. I don't think that that means that they have to be identical, but they do have to be much closer than what we're talking about here. Um, so how do we tell the difference? This is a very sincere question, by the way, how do we tell the difference? I think for one, you can look at the nature of the alleged infraction. Um, you can look at, um, I think that's the most important, uh, consideration, um, the nature of the, the infraction that's looked at in police contexts in numerous types of cases. You look at that in the context of an excessive force case or other qualified immunity cases. Um, now by the nature of the infraction, I mean, how big a crime it is. No, I mean, specifically what infraction are we talking about? You know, for example, in this case, Ms. Messimer is asking the court to look at the interaction with the white couple who was, uh, driving on the wrong way on a one way street in the park, as opposed to this, which is a parking in front of a fire hydrant. Um, so those are not, they're not the same type of violation, but doesn't that argue against you because, you know, parking in Missouri doesn't even count against your driver's license. Uh, whereas anything else does. So I'd be more worried about the more serious cases, but tell me if I don't get it. Well, it's not necessarily the, what I'm saying is in terms for them to be similarly situated in all relevant respects, it needs to, it needs to be a closer call than anything that Mr. Saunders has put forth in this case. So for example, if we look at Jelani, Mr. Jelani used as a comparator, a white woman who was also walking down the street, which is what he was, um, what, what he was, um, uh, brought, what brought him to the attention of the police officers. Um, and he argued that the disparate treatment there, um, showed evidence of discriminatory animus. Um, but the court in through that determined that even though they were doing the same thing, they weren't similarly situated because the officers, when they met with Mr. Jelani were investigating a report of a suspicious person. And so the woman didn't meet that, that, that description. And whereas Mr. Jelani arguably did. So that was a closer call than what we have here. And yet in that case, the court still didn't find that that was a comparator. In this case, Ms. Messner is trying to compare Officer Teese's interactions with the two drivers, comparing the drivers in Union Park against each other. They're not comparators for this case because they weren't, it wasn't a parking violation, parking in front of the fire hydrant. It's not the same offense. I think at a bare minimum, in order for them to be considered similarly situated in all relevant respects, which is what this court's precedent requires, it needs to be at a bare minimum, the same offense. Boy, I better be hard to find parking offenses, but would you take parking and speeding in terms of whether the drivers are treated? Yeah. Uh huh. Are those close enough in offenses a mile over the speed limit and parking in the fire fire? I don't think so. Your honor. I think for example, one's a moving violation and one's a non-moving violation. There's case law in this circuit regarding whether that constitutes a difference for purposes of this analysis. There's not real clear authority one way or another on that, but in any event, I think that even if this court determined that the one interaction with a white couple that is part of the summary judgment record, even if that does constitute someone who's similarly situated, that's not sufficient evidence to show a discriminatory purpose and a discriminatory effect. Counsel, I'm sure you've watched this video of this contact with Mr. Sanders. You probably watched it many times. What about or what do we make of the attitude of the officer? And counsel alluded to it when Mr. Sanders asked if there was a problem or what's the problem, and instead of giving a direct answer, the officer, I would say, sarcastically responds, you know, other than this, this, and this. What do we make of that and the demeanor, the behavior of the officer as he goes about the business of this citizen contact? Well, I think that that's a stylistic quirk that Officer Thies might have, and I think that that's reflected across all of the videos that are part of the record. Ms. Thies, I'm sorry, Ms. Messmer, in her argument, said herself that he has a kind of a different manner of working with folks, and I don't think that the way he answered that question is indicative of any discriminatory animus, and that's what's important. Just like the court said, there was a case, I think it was Crooks, but I want to make sure, I'm sorry, Clark, I want to make sure I get it right. The court looked at the language of the officer. The officer in that case said, don't play the race card with me, and the court found that that was not sufficient evidence to show any discriminatory animus on the part of that officer. There's simply nothing, although there may be some quirks with the way that Officer Thies interacts with folks when he pulls them over, there's nothing in any of this that shows any discriminatory animus. None of his comments. I thought the plaintiff did have some testimony, or I'm sorry, I don't know what it is, you need to tell me, that there was non-compliance with standard police procedure. Don't they have some evidence of that, and we interpret it favorable to them? I'm not aware of any decision in this court, Your Honor, that says that departure from standard police procedure is evidence of discriminatory motive. I thought it was in some investigation of this very officer that that was said, but you tell me if it's not in the record, we have a lot of cases. Well, no, I guess I just want to make sure I'm clear on what I'm saying and what I'm not saying, Your Honor. What I'm saying is I'm not aware of any cases within this circuit that say that departure from standard procedures is evidence of racial animus or for example, that they were in the wagon as opposed to being in a squad car. But as the court knows, when an officer's on patrol, if they witness a criminal violation happen in front of them, which is what happened in this case, and then within seconds of investigating that infraction, discover evidence of two more potential violations, they certainly are entitled to follow up on that, and that's not evidence of discriminatory intent. Okay, your time's expired. Thank you for the argument. Ms. Mesper? You're muted. Thank you, Your Honors. I want to address this issue of, well, what's the alternative explanation if this isn't bias? Mr. Guidelock argues, well, these are just stylistic quirks. But if that were true, the city, these defendants would have submitted videos showing Officer T is treating white motorists the same way that he's treating the black motorists. Who's the burden on counsel? I hate to interrupt your argument. Isn't the burden on you to do something like that? Go ahead. Well, I think that as the move-ins, they have some of the burden there initially, but I also think I did provide those videos of white and black motorists being treated differently, and it's undisputed on this record. The defendants did not dispute any of the pattern evidence showing that Officer T's followed black motorists for extended periods and then pulled them over without reasonable suspicion or probable cause. The defendants don't have an explanation for that. They don't have other swaps of white people where these same things are happening, so they just deny them as irrelevant. I think that's really incredible because these videos show this pattern of activity and it's unrebutted that he's doing this only to black people. So yes, I know that there's only a couple times where we can show he's treating white motorists differently and better in very similar circumstances, but that is enough, I think, evidence to trigger this. Well, I've got to interrupt you again. I thought there was just the one case of the people in the park. Is that you're counting that as two? I'm counting the people in the park, and then I'm also, I also think there's something to, I think something can be extrapolated from the fact that he's not looking at the parking violation of the other cars on the same street. Okay, okay, proceed. Because the race was unknown there, but the fact that their race is unknown and Mr. Saunders is known to be a black man, those two are treated differently. Well, counsel, I've watched this video. When did, when do you think the profiling began? I mean, in other words, how did, in your view, what's the evidence that these officers, this particular officer, would have known the race of the driver of this vehicle? I mean, it's at night, darkened vehicles. What's your evidence there? I'm glad you asked that question, your honor, because this stop didn't, or this interaction didn't start when Courtney Saunders pulled up by the fire hydrant. It started several blocks before that, even before the body camera was activated. When these officers, they were at an intersection, Mr. Saunders crossed them, and then the officers pulled behind him, followed him for several blocks. Then they followed him through these two turns that he made to get to his brother's house. So, in the course of following him, Mr. Saunders, for those two blocks, and then before they turned, Officer Tease, it's right when the video starts, Officer Tease is pulled up next to Mr. Saunders. Mr. Saunders has testified, it's in his deposition, that they made eye contact. So he would have seen Mr. Saunders' obviously black face, and at that point, he breaks quickly, as Mr. Tease does, to get behind Mr. Saunders and then follow him. So it's not just that he like happened to pass by somebody who was parked by a fire hydrant. He explicitly followed this black motorist through a, you know, unique driving pattern that wasn't just happened to be the officer Tease was going that same way, and then this interaction ensued. Okay, and counsel, your time is now expired. Thank you. Thank you, counsel, for the argument here, and case number 21-2180 is submitted for decision.